# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**JERRY LEE HOPKINS,**

      **Petitioner,**

**v.**                    **Case No. 8:15-cv-183-MSS-AAS**

**SECRETARY, DEPARTMENT**
**OF CORRECTIONS,**

      **Respondent.**

_____/

## O R D E R

Hopkins filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court convictions for first-degree murder, attempted armed robbery, and attempted burglary. After reviewing the petition (Doc. 1), the response (Doc. 21), and the relevant state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Hopkins guilty of first-degree murder, attempted armed robbery, and attempted burglary. (Respondent's Exhibit 1a at 264) The trial judge sentenced Hopkins to life in prison for the first-degree murder conviction, twenty-five years in prison for the attempted armed robbery conviction, and life in prison for the attempted burglary conviction. (Respondent's Exhibit 1a at 266–70) Hopkins appealed, and the state appellate court affirmed his convictions and sentences. (Respondent's Exhibit 5) Hopkins filed a petition for a writ of certiorari in the United States Supreme Court

(Respondent's Exhibit 11), and the United States Supreme Court denied the petition. (Respondent's Exhibit 13)

Hopkins filed a petition alleging ineffective assistance of appellate counsel (Respondent's Exhibit 14), and the state appellate court denied relief. (Respondent's Exhibit 15) Hopkins filed a motion for post-conviction relief (Respondent's Exhibit 28 at 22–66), the post-conviction court denied relief after an evidentiary hearing (Respondent's Exhibits 28 at 68–77 and 28a at 373–77), and the state appellate court affirmed. (Respondent's Exhibit 33) Hopkins's federal petition followed.

## FACTS

On August 4, 2003, Amad Taha died from a gunshot wound on the front doorstep of his home. (Trial Transcript at 410–12, 499–503, 672–78, 707)[1] Around 4:30 A.M., a neighbor called 911 when he saw Taha's feet sticking out of the front door. (*Id.* at 405–06) An officer approached Taha's home, heard Taha's brother screaming, and found Taha on the ground with a gunshot wound to his head and bruises around his eyes. (*Id.* at 410–12) At the home, a crime scene investigator found a bullet casing, a bullet, blood, and a pair of black sandals. (*Id.* at 421, 423–28, 430–31, 440–41, 443–45, 451)

The evening before, a clerk who worked at a nearby gas station saw Taha and Latoya Gunsby together. (Trial Transcript at 544–49) In the early morning of Monday,

---

[1] With the response to the petition, the Respondent filed a paper copy of the exhibits that contain the relevant state court record. The Respondent's Exhibits 1a, 1b, 1c, 1d, 1e, 1f, and 1g contain the trial transcript.

August, 4, 2003, another neighbor saw a white SUV parked near Taha's home with the high beam lights illuminated. (*Id.* at 556) The neighbor saw two African American men standing next to the SUV and speaking to a person inside the SUV. (*Id.* at 556)

Jason Putnam, the driver of the white SUV, testified at trial. Putnam testified that he had known Hopkins and Walter Leon Simmons since he was young. (Trial Transcript at 574–77) Putnam met Gunsby because she was Hopkins's girlfriend. (*Id.* at 577) On the afternoon of Sunday August 3, 2003, Hopkins asked Putnam to pick him up and give him a ride to pick up some money. (*Id.* at 578, 581–82) Putnam drove his white Ford Expedition, picked Hopkins up, and drove to pick Simmons up at his home. (*Id.* at 579–83) Putnam drove Hopkins and Simmons to pick Gunsby up at her home. (*Id.* at 584–86) Hopkins told Putnam, Simmons, and Gunsby that he planned to rob Gunsby's friend. (*Id.* at 587–88) Gunsby said that her friend would pick her up and take her to his house and that at her friend's house she would flicker a light to signal to them that they could safely commit the crime. (*Id.* at 588–89)

Putnam drove Gunsby to a gas station, saw Gunsby enter her friend's car, and followed the car to her friend's home. (Trial Transcript at 590–94) Putnam dropped Simmons and Hopkins off at a stop sign and drove around the neighborhood for about half an hour. (*Id.* at 594–96) Simmons and Hopkins returned to the car, and Hopkins said that Gunsby did not send them a signal. (*Id.* at 596–97) The three men drove to Gunsby's home, and Gunsby told them that she sent them a signal and complained that they did not see the signal. (*Id.* at 597–98) Gunsby called her friend and told him

3

that she planned to return to his home with her cousin. (*Id.* at 598) Gunsby told Putnam, Simmons, and Hopkins that her friend kept money in a safe and that she knew the combination to open the safe. (*Id.* at 599–600) Gunsby described the crime as a "sweet lick," which meant a robbery. (*Id.* at 599)

Putnam drove Hopkins, Simmons, and Gunsby back to the neighborhood where Gunsby's friend lived. (Trial Transcript at 600) The group discussed that Hopkins and Simmons would enter the home and tie Gunsby's friend up, after Gunsby sent a signal. (*Id.* at 600) Putnam saw Hopkins with an object that appeared to be a firearm wrapped in a towel. (*Id.* at 600–01) Hopkins told Putnam that he needed the firearm in case another person was inside the home. (*Id.* at 601–02)

Putnam first dropped Gunsby off, drove further, and dropped Hopkins and Simmons off at the same stop sign where he dropped them off before. (Trial Transcript at 602–03) Five minutes later, Hopkins, Simmons, and Gunsby ran back to Putnam's car. (*Id.* at 603–04) Hopkins said that he had "fucked up" and shot a person. (*Id.* at 605–06) Hopkins explained that, when he entered the home, Gunsby's friend appeared to reach for something in his pocket, and Hopkins raised his gun to the back of the friend's head and shot him. (*Id.* at 625–26) As they were leaving the area, Hopkins told the others not to say anything if anyone asked about what occurred. (*Id.* at 608) Hopkins asked Putnam to "get rid of" the firearm, and Putnam refused. (*Id.* at 621)

A few days later, Hopkins called Putnam to remind him not to say anything if anyone asked about what occurred. (Trial Transcript at 609) Later that week, Putnam told his younger sister, Joann, about the crimes and traveled to Mississippi to stay with

4

family because he feared that Hopkins and the others would blame him for the crimes. (Trial Transcript at 610) A few days later, Putnam's sister called Putnam to tell him that the police contacted her, and Putnam returned to Florida after speaking with his father. (*Id.* at 612–13) Putnam spoke with detectives after his parents encouraged him to cooperate. (*Id.* at 613–14)[2]

Three latent footprints at Taha's home matched Gunsby's footprints. (Trial Transcript at 464–68, 524) A crime scene investigator identified a substance that looked like blood on a headliner and on a sweatshirt in Putnam's white SUV. (*Id.* at 436–38, 452–54) DNA profiles from four spots of blood on the outside of the sweatshirt matched Taha's DNA profile. (*Id.* at 727–29, 765–68) DNA profiles from two spots of blood on the inside sleeve of the sweatshirt matched Hopkins's DNA profile. (*Id.* at 729–30, 768) Also, a DNA profile from blood on the headliner of the SUV matched Hopkins's DNA profile. (*Id.* at 731–32, 768)

Hopkins, a twice convicted felon, testified in his own defense to the following. (Trial Transcript at 807) Hopkins met Putnam and Simmons when they were young. (*Id.* at 807–08) He started dating Gunsby about two or three months before the crimes. (*Id.* at 811–12) He denied that he shot Taha and denied that he attempted to rob him or burglarize his home. (*Id.* at 814, 820–21, 835)

---

[2] During cross-examination, the defense impeached Putnam with several prior inconsistent statements that he made during his interview with detectives and during his deposition. (Trial Transcript at 628–60) To rehabilitate Putman's testimony, the prosecutor introduced into evidence prior consistent statements by Putman to his sister, Joann, just after the crimes. (*Id.* at 690–91)

Hopkins testified that he spent the night of Sunday, August 3, 2003, with Tiffany Watkins watching a movie and playing cards. (Trial Transcript at 822–28)[3] Hopkins testified that Putnam frequently drove him in the white SUV. (*Id.* at 815) He testified that, sometimes in the morning, when Putnam drove him to work, he put on a jacket or sweatshirt that he found in the SUV to warm up. (*Id.* at 815, 817–19) He testified that he worked as a carpenter and often cut or scraped his hands and elbows. (*Id.* at 816–17) He contended that his blood appeared on the sweatshirt because of those cuts and scrapes. (*Id.* at 817, 819–20)

On rebuttal, a detective testified that Hopkins voluntarily came to the police station for an interview before his arrest. (Trial Transcript at 955–56) The detective testified that Hopkins claimed that he spent the evening of Sunday, August 3, 2003, at a friend's home. (*Id.* at 957) The detective testified that Hopkins stated that, in the early morning of August 4, 2003, his cousin, Maurice, drove him to pick Gunsby up from another friend's home. (*Id.* at 958–59)

---

[3] Watkins, who was Hopkins's friend before his arrest and became romantically interested in Hopkins after his arrest, testified and corroborated Hopkins's alibi. (Trial Transcript at 891–98) On cross-examination, Hopkins admitted that he did not disclose the alibi to his attorney until fourteen months after his arrest. (*Id.* at 851)

## STANDARDS OF REVIEW

### AEDPA

Because Hopkins filed his federal petition after the enactment of the

Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v.*

*Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary
>        to, or involved an unreasonable
>        application of, clearly established
>        Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on
>        an unreasonable determination of the
>        facts in light of the evidence presented
>        in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court

arrives at a conclusion opposite to that reached by [the United States Supreme Court]

on a question of law or if the state court decides a case differently than [the United

States Supreme Court] has on a set of materially indistinguishable facts." *Williams v.*

*Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of

clearly established federal law "if the state court identifies the correct governing legal

principle from [the United States Supreme Court's] decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

Clearly established federal law refers to a holding of an opinion by the United States Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Hopkins asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requires a defendant to demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to

merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Also, a petitioner's failure to comply with a state procedural rule governing the proper presentation of a claim bars review of that claim on federal habeas. *Coleman*, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the

state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

In his federal petition, Hopkins asserts twenty-four grounds for relief. (Doc. 1 at 7–9) The Respondent asserts that Ground One through Ground Five, Ground Eight through Ground Nineteen, Ground Twenty-One, and Ground Twenty-Three are procedurally barred. (Doc. 21 at 15, 21–30, 32, 36–43) For judicial efficiency, the Court will first address whether any claims are procedurally barred. The Court will then address the merits of any remaining claims.

## PROCEDURAL BAR

**Ground One**

Hopkins asserts that the trial judge violated his federal rights by overruling the defense's objection to the prosecutor's exercise of a peremptory strike on Karen Santiago, an Hispanic female. (Doc. 1 at 7) Hopkins failed to raise the claim in his brief on direct appeal. (Respondent's Exhibit 2)[4] However, the Respondent

---

[4] In the appendix, the Respondent submitted both an 88-page initial brief and a 51-page initial brief filed by Hopkins on direct appeal. A judicially noticed docket from the direct appeal shows that Hopkins first filed the 88-page brief with a motion for leave to file an oversized brief. After the state appellate court denied the motion,

erroneously concedes that the claim is "exhausted to the extent [that the claim is] raised in [Hopkins's] state habeas petition alleging ineffective assistance of appellate counsel and as ground nine in his Rule 3.850 motion." (Doc. 21 at 15) Because the Respondent waived any defense that the claim of trial error is unexhausted, review will proceed to the merits of the claim of trial error. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Vazquez v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 964, 966–67 (11th Cir. 2016) (citing 28 U.S.C. § 2254(b)(3)).

**Ground Two**

Hopkins asserts that the trial judge violated his federal right against self-incrimination by admitting into evidence testimony by a detective that during an interrogation Hopkins refused to answer questions and asked for an attorney. (Doc. 1 at 7) The Respondent asserts that Hopkins failed to fairly present a federal claim on direct appeal. (Doc. 21 at 21–23)

In his brief on direct appeal, Hopkins asserted the claim and cited *State v. DiGuilio*, 491 So. 2d 1129 (Fla. 1986), to argue that a comment on a defendant's silence violates the defendant's rights. (Respondent's Exhibit 2 at 19) Because *DiGuilio*, 491 So. 2d at 1131, cites *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Michigan v. Mosley*, 423 U.S. 96 (1975), and because Hopkins cited the Fifth Amendment in his brief (Respondent's Exhibit 2 at 19), Hopkins fairly presented the federal nature of his claim to the state court. *Lucas v. Sec'y, Dep't Corrs.*, 682 F.3d

_____

Hopkins filed the 51-page brief. Consequently, the 51-page brief is the operative brief. *See Hopkins v. State*, No. 2D05-1319 (Fla. 2d DCA).

1342, 1352 (11th Cir. 2012) ("To 'fairly present' a claim, the petitioner is not required to cite 'book and verse on the federal constitution.'") (quoting *Picard*, 404 U.S. at 278).

### Ground Three

Hopkins asserts that the prosecutor violated his federal rights during closing argument by bolstering the credibility of a witness, misstating the evidence, and denigrating the defense. (Doc. 1 at 7) The Respondent asserts that the claim is procedurally barred because Hopkins failed to preserve the issue for review on direct appeal. (Doc. 21 at 24–27)

In his brief on appeal, Hopkins raised a similar claim, challenged nine comments by the prosecutor during closing, and argued that fundamental error cumulatively arose from the allegedly prejudicial comments. (Respondent's Exhibit 2 at 20–37) In its brief on appeal, the State of Florida argued that Hopkins failed to preserve the issue for review as follows (Respondent's Exhibit 3 at 28):

> [A] motion for mistrial based on the prosecutor's [comments] during closing argument was never made during the trial. This issue has not been preserved for appellate review and should be deemed waived.
>
> In order for argument of counsel to be cognizable on appeal, it must present the specific contention asserted as legal ground[s] for the objection in the trial court. *Steinhorst v. State*, 412 So. 2d 332, 334 (Fla. 1982). An appellate court should confine itself to reviewing only those question[s] that were previously presented to the lower court. *Silver v. State*, 188 So. 2d 300 (Fla. 1966). Therefore, appellate review of these remarks is unavailable. Appellant should not be permitted to initiate a new argument on appeal. *Steinhorst*, [412 So. 2d at 334].

The state appellate court affirmed Hopkins's convictions and sentences in a decision without a written opinion. (Respondent's Exhibit 5)

"[The Eleventh Circuit] to a point has presumed that when a procedural default is asserted on appeal and the state appellate court has not clearly indicated that in affirming it is reaching the merits, the state court's opinion is based on the procedural default." *Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989). Yet, Hopkins asserted a claim based on fundamental error, and a state appellate court reviews an unpreserved issue for fundamental error. § 924.051(3), Fla. Stat. *Bell v. State*, 108 So. 3d 639, 650 (Fla. 2013) ("Fundamental error is that which reaches down into the validity of the trial such that a guilty verdict . . . could not have been obtained without the assistance of the alleged error. . . . [T]he Court examines the totality of the errors in the closing argument and determines whether the cumulative effect of the numerous improprieties deprived the defendant of a fair [trial].") (citations and internal quotations omitted).

Because the state appellate court reviewed Hopkins's claim for fundamental error even if the claim was not preserved, the record rebuts the presumption that the state appellate court imposed the procedural bar for lack of preservation. *Sinclair v. Wainwright*, 814 F.2d 1516, 1522 (11th Cir. 1987).

**Ground Four**

Hopkins asserts that the trial judge violated his federal rights by admitting Putman's out-of-court statement to his sister, Joann. (Doc. 1 at 7) The Respondent

asserts that the claim is procedurally barred because Hopkins failed to fairly present the federal claim on direct appeal. (Doc. 21 at 28–30)

In his brief on appeal, Hopkins raised a similar claim but cited only state rules of evidence and state court opinions. (Respondent's Exhibit 2 at 37–43) Because Hopkins did not cite any federal authorities or label the claim "federal," Hopkins failed to alert the state appellate court to the federal nature of his claim. *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

If Hopkins returned to state court to fairly present the claim, the post-conviction court would deny the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claim is procedurally defaulted in federal court. *Snowden*, 135 F.3d at 736. Because Hopkins fails to demonstrate that either cause and prejudice or a manifest injustice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Four is **DISMISSED** as procedurally barred.

**Ground Five**

Hopkins asserts that the trial judge violated his federal rights by excluding as hearsay his testimony that Gunsby asked him "to provide her with an alibi if police came." (Doc. 1 at 7)

The Respondent argues that Hopkins did not exhaust the claim because he failed to alert the state appellate court to the federal nature of his claim. (Doc. 21 at 32) In his brief on direct appeal, Hopkins asserted that the trial court erroneously excluded the testimony as hearsay, cited a Florida rule of evidence and state court opinions, and argued that "a statement is not excludable as hearsay when it is not offered to prove the truth of assertions of fact contained in the statement." (Respondent's Exhibit 2 at 43–48)

In a string cite of eight opinions in the middle of the analysis of the issue, Hopkins cited four federal circuit court opinions. (Respondent's Exhibit 2 at 46) None of the federal circuit court opinions analyze a federal due process claim. *United States v. Shepherd*, 739 F.2d 510, 514 (10th Cir. 1984) (analyzing whether testimony was hearsay under Federal Rule of Evidence 801(c)); *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) (same); *United States v. Oguns*, 921 F.2d 442, 448–49 (2d Cir. 1990) (same); *United States v. Wright*, 343 F.3d 849, 865–66 (6th Cir. 2003) (same).

Also, a citation to a federal circuit court opinion in a string cite in the middle of an appellate brief does not alert a state court to the federal nature of a claim. Because Hopkins failed to both identify the legal standard for a federal due process

claim and apply that legal standard to the facts of his case, Hopkins failed to fairly present a federal due process claim. *Duncan*, 513 U.S. at 366. *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) ("We therefore hold that '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"); *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004) ("We simply require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation.").

If Hopkins returned to state court to fairly present the claim, the post-conviction court would deny the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c). Consequently, the claim is procedurally defaulted in federal court. *Snowden*, 135 F.3d at 736. Because Hopkins fails to demonstrate that either cause and prejudice or a manifest injustice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Five is **DISMISSED** as procedurally barred.

**Ground Eight**

Hopkins asserts the following in support of Ground Eight (Doc. 1 at 7–8):

> [Hopkins] alleges he was subjected to selective prosecution and had his accusers (co-defendants turned State's witnesses) been investigated and equally tested (mouth swabs), [ ] the true shooter in the case would have been conclusively revealed instead of [Hopkins] being falsely accused and convicted primarily upon false and fabricated

17

testimony. The additional testing of the physical evidence believed to contain DNA, and latent prints, and mitochondrial DNA results would clearly exonerate [Hopkins] from being at the scene of the crime. DNA evidence [is] in evidence storage and [is] exculpatory in proving someone else as the true perpetrator and the true identity of the true perpetrator is still in dispute.

The Respondent asserts that the claims are procedurally barred because Hopkins failed to fairly present the claims in state court. (Doc. 21 at 36–37) Hopkins contends that he raised the claims in a motion for DNA testing. (Doc. 1 at 3)

In a motion for DNA testing, Hopkins requested DNA testing of items to prove his innocence and contended that the prosecutor selectively charged him in his case. (Respondent's Exhibit 17 at 1–4) The post-conviction court dismissed the motion as facially deficient and granted Hopkins leave to file an amended motion. (Respondent's Exhibit 18) In an amended motion, Hopkins abandoned any claim of selective prosecution but again requested DNA testing of items to prove his innocence. (Respondent's Exhibit 19) The post-conviction court denied the motion because Hopkins failed to demonstrate how additional DNA testing would exculpate him. (Respondent's Exhibit 20)

Even if the post-conviction court had granted Hopkins's motion for DNA testing, the post-conviction court would not have granted Hopkins relief from his convictions and sentences. Hopkins filed his amended motion under Florida Rule of Criminal Procedure 3.853 (Respondent's Exhibit 19), which "provides procedures for obtaining DNA (deoxyribonucleic acid) testing under Sections 925.11 and 925.12, Florida Statutes." Fla. R. Crim. P. 3.853(a). "If the movant is successful,

those procedures culminate only in 'the results of the DNA testing ordered by the court [being] provided in writing to the court, the movant, and the prosecuting authority.'" *Brown v. Sec'y, Dep't Corrs.*, 530 F.3d 1335, 1337 (11th Cir. 2008) (quoting Fla. R. Crim. P. 3.853(c)(8)). "[A] Rule 3.853 proceeding involves an application for discovery only, pursuant to which the court lacks authority to order relief from the movant's sentence or conviction based on the DNA test results." *Brown*, 530 F.3d at 1337. "If the movant believes those results provide a basis for a successful collateral attack on his judgment of conviction, he may then institute a proceeding under Florida's collateral attack rules and only in that manner secure such relief." *Brown*, 530 F.3d at 1337. Consequently, Hopkins did not fairly present a substantive federal claim in his motion for DNA evidence. *Mauk v. Lanier*, 484 F.3d 1352, 1358 (11th Cir. 2007) (citing *Castille v. Peoples*, 489 U.S. 346, 350–51 (1989)).

If Hopkins returned to state court to raise a federal claim, the post-conviction court would deny the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c), (h). Consequently, the claim is procedurally defaulted in federal court. *Snowden*, 135 F.3d at 736. Because Hopkins fails to demonstrate that either cause and prejudice or a manifest injustice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Eight is **DISMISSED** as procedurally barred.[5]

---

[5] Even if exhausted, the claim is meritless. Hopkins contends that additional DNA testing and analysis of fingerprints would exonerate him. However, Hopkins fails to

### Ground Nine through Ground Nineteen, Ground Twenty-One, and Ground Twenty-Three

In Ground Nine, Hopkins asserts that trial counsel deficiently performed by not challenging Putnam's competency to testify. (Doc. 1 at 8) In Ground Ten, Hopkins asserts that trial counsel deficiently performed by not moving for testing of evidence discovered at the crime scene. (Doc. 1 at 8) In Ground Eleven, Hopkins asserts that trial counsel deficiently performed by not moving to prohibit the prosecutor from arguing that a grand jury indicted Hopkins. (Doc. 1 at 8) In Ground Twelve, Hopkins asserts that trial counsel deficiently performed by not presenting testimony by a co-defendant at trial. (Doc. 1 at 8) In Ground Thirteen, Hopkins asserts that trial counsel deficiently performed by not arguing that the prosecutor's failure to present testimony by Simmons at trial violated his right to confrontation. (Doc. 1 at 8) In Ground Fourteen, Hopkins asserts that trial counsel deficiently performed by moving to exclude any evidence of his prior convictions. (Doc. 1 at 8) In Ground Fifteen and Ground Sixteen, Hopkins asserts that trial counsel deficiently performed by not presenting testimony by witnesses at trial that supported his alibi and misidentification defenses. (Doc. 1 at 8)

In Ground Seventeen, Hopkins asserts that trial counsel deficiently performed by not objecting to the prosecutor's exercise of peremptory challenges to African

---

support his claim with new exculpatory evidence. Because "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation," the claim is meritless. *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985).

American and Hispanic jurors. (Doc. 1 at 8) In Ground Eighteen, Hopkins asserts that trial counsel deficiently performed by not requesting that the trial judge interview each juror to determine whether an emotional outburst by Taha's family affected the juror's ability to act fairly and impartially. (Doc. 1 at 8) In Ground Nineteen, Hopkins asserts that trial counsel deficiently performed by not moving for a judgment of acquittal. (Doc. 1 at 8) In Ground Twenty-One, Hopkins asserts that trial counsel deficiently performed by not objecting to the prosecutor's seizure of his legal mail in jail. (Doc. 1 at 8) In Ground Twenty-Three, Hopkins asserts that trial counsel deficiently performed by not objecting to the prosecutor's comments during closing and for not moving for a mistrial. (Doc. 1 at 9)

The Respondent asserts that the claims are procedurally barred because Hopkins failed to raise the claims in his brief on post-conviction appeal. (Doc. 21 at 37–43) Because the post-conviction court denied the claims after an evidentiary hearing (Respondent's Exhibit 28 at 373–77), Florida Rule of Appellate Procedure 9.141(b)(3)(C), required Hopkins to file a brief on appeal. *See Cunningham v. State*, 131 So. 3d 793, 795 (Fla. 2d DCA 2012).

On post-conviction appeal, appointed appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). (Respondent's Exhibit 29) In the *Anders* brief, appellate counsel identified the following issue as arguably meritorious: (1) the post-conviction court erroneously denied the claim that trial counsel deficiently performed by opening the door to the admission of evidence that violated Hopkins's right against self-incrimination. (Respondent's Exhibit 29 at 24) The state appellate

court provided Hopkins an opportunity to submit a *pro se* brief. (Respondent's Exhibit 30) In his *pro se* brief, Hopkins argued that the post-conviction court erroneously denied the following two claims: (1) trial counsel deficiently performed by not requesting a jury instruction for an alibi defense; (2) trial counsel deficiently performed by opening the door to the admission of evidence that violated his right against self-incrimination. (Respondent's Exhibit 31 at 4–12) Hopkins did not present any argument in support of the claims in Ground Nine through Ground Nineteen, Ground Twenty-One, and Ground Twenty-Three.

In the section of his brief titled Summary of the Argument, Hopkins stated (Respondent's Exhibit 31 at 3): "Appellant would like the appeal courts to review all sixteen issues raised in his original [Rule] 3.850 [motion] filed on August 31, 2009." Because Hopkins failed to present any argument in support of his appeal of the denial of these claims, Hopkins failed to fairly present the claims on post-conviction appeal. *See Shere v. State*, 742 So. 2d 215, 218 n.6 (Fla. 1999) ("In a heading in his brief, Shere asserts that the trial court erred by summarily denying nineteen of the twenty-three claims raised in his 3.850 motion. However, for most of these claims, Shere did not present any argument or allege on what grounds the trial court erred in denying these claims. We find that these claims are insufficiently presented for review."); *Sweet v. State*, 810 So. 2d 854, 870 (Fla. 2002) (explaining that "simply recit[ing] these claims from his postconviction motion in a sentence or two, without elaboration or explanation," fails to preserve [the issue] for appellate review).

Because Hopkins failed to fairly present the claims on post-conviction appeal, he failed to give the state court one full opportunity to resolve the federal claims by invoking one complete round of the state's established appellate review process. *O'Sullivan*, 526 U.S. at 845. If Hopkins returned to state court to raise the claims, the post-conviction court would deny the claims as procedurally defaulted. Fla. R. Crim. P. 3.850(b) and (h). Consequently, the claims are procedurally defaulted in federal court. *Snowden*, 135 F.3d at 736. Because Hopkins fails to demonstrate that either cause and prejudice or a manifest injustice based on actual innocence excuses the procedural default, the claims are procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Nine, Ground Ten, Ground Eleven, Ground Twelve, Ground Thirteen, Ground Fourteen, Ground Fifteen, Ground Sixteen, Ground Seventeen, Ground Eighteen, Ground Nineteen, Ground Twenty-One, and Ground Twenty-Three are **DISMISSED** as procedurally barred.

# MERITS

## Ground One

Hopkins asserts that the trial judge violated his federal rights by overruling the defense's objection to the prosecutor's exercise of a peremptory strike on Karen Santiago, a Hispanic female. (Doc. 1 at 7)

During voir dire, the trial judge overruled the defense's objection to the prosecutor's exercise of a peremptory strike on Santiago as follows (Trial Transcript at 351):

| | |
|---|---|
| [Prosecutor:] | Yes, sir, we would challenge Miss Santiago. |
| [Trial counsel:] | Judge, I'd ask for a race neutral reason and let the record reflect that she has [ ] Latino heritage. I believe she's actually from Puerto Rico. |
| [Prosecutor:] | Judge, is that a protected group? |
| [Trial judge:] | I don't think so, peremptory challenge on Santiago is accepted. . . . |

At the beginning of the second day of trial, the prosecutor provided the trial judge with a state court opinion that holds that Hispanics are a protected group. (Trial Transcript at 488–89) The trial judge reconsidered his ruling as follows (*Id.* at 488–92):

| | |
|---|---|
| [Trial judge:] | Mr. Castillo has been kind enough to hand to me *Alsopp versus State* at 855 Southern Second, 695, a decision of the Florida Supreme Court finding that, indeed, Hispanic is a race. And you have to conduct a *Melbourne* |

24

inquiry whenever the objection is made, which I didn't do. Finding that Hispanic is not a race. It is an ethnicity. But, Mr. Castillo, can you tell me why you elected to strike Miss Santiago?

[Prosecutor:] Yes, sir, Judge, and I think you are going in the direction as prescribed by the *Smith* case. The court will recall the testimony of the comments by Miss Santiago, yesterday. She indicated that there had been an incident in New York where she was riding on a subway or some type of transportation and there had been a chain taken from her neck. Um, that she also indicated that she did not report that matter to law enforcement. And I remember specifically asking her or her volunteering, but the comment was made by her that she did not report that incident. There wasn't a pursuit by me along those lines after the comment. I have asked the court reporter to get to that location if it becomes a factual dispute, as to what took place.

Afterwards, we had gone back and gone through the jury list, and she was not one of the ones we initially struck. I had, in talking to Mr. Antonello, and looking back on it, [thought] that she might have a feeling or opinion that, or a willingness on her part to accept crime as going unpunished, that she wasn't interested enough to pursue that. And I began to think she may have those same feelings in this case, and she became a very late strike in this case. That wasn't something that jumped out at me. But something I thought about [ ] later in evaluating her comments, and it was in more

extensive analysis. That was the reason.

[Trial judge:]      Mr. Mills?

[Trial counsel:]      This is the explanation — I find that the explanation is pretextual. This should have been laid earlier, and the State's explanation, now, should be considered procedurally barred. I made the objection at the proper time. They should have give[n] their response at the proper time.

[Prosecutor:]      May I respond to that, your Honor?

[Trial counsel:]      Miss Garrett points out that Mr. Castillo didn't follow up with that line of questioning and that argument doesn't make sense because what Miss Santiago was explaining was [ ] not that she didn't consider crime to be important. That she was surprised that it happened to her. She had lived so long in that area, she was surprised. People have a negative impression with regard to crime in New York, and she had never been the victim of such an event.

[Prosecutor:]      May I ask you to examine what the *Smith* case has said regarding the analysis on step two. The reason the State has given, I don't think you have the *Smith* case before you. If I may tender it? Judge, for the record, in *Smith versus State*, 799 Southern Second, 421, and it outlines the procedure in some detail on step three. I think we are beyond step one, where Mr. Mills made the objection. This step requires the strike, reasons for the strike, this inquiry shifts the exercising

of the strike for [a] race neutral explanation. The explanation need only be factually neutral, not persuasive or plausible. Citing *Jones versus State*, step three requires credibility analysis by the trial court. If the court believes all the circumstances are factual and not a pretext, the strike is sustained. The court's focus of the inquiry is the credibility of the strike, not the reasonableness of the strike.

[Trial judge:]    [I] [f]ind the explanation is racially neutral, and it is supported by the record. I also find the defense's position that the prosecutor has struck Miss Santiago out of some form of animus against Hispanics to be both absurd and insulting and unprofessional.

The trial judge's determination of facts is presumed correct, and Hopkins fails to rebut the determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

During voir dire, Juror Santiago responded to a question by trial counsel about crime as follows (Trial Transcript at 110–13):

[Trial counsel:]    Um, all right, I'm going to change direction here a little bit. Several of you have talked about having some experience, I'm thinking of, especially Miss Fuqua mentioned it, and Mr. Davis in the case of his wife, having been a victim of a crime. I don't think anybody else wrote in their questionnaire that they, themselves, or someone in their family [was a victim of crime]. It sometimes happens that when people start talking about a crime

in court, you think of another occasion. I'm going to start by asking that question, the question to all of you as [a] group, in the course of our talking, if anybody recalls an occasion when they were a victim of a crime? I see hands over here.

. . .

All right. Thank you very much. Miss Santiago, did I see you put your hand up?

[Juror Santiago:]    Yeah. It was a minor incident right before I moved down. In 1989, my chain was snatched in the subway. Um, no law enforcement was involved or anything. But, I was taken aback because I was born and raised and I never — whatever people said about assaults and stuff like that, it never happened to me.

[Trial counsel:]    So, the way you heard about how things happen in New York, it never happened to you before?

[Juror Santiago:]    No.

[Trial counsel:]    And you said the law wasn't involved, you never called anybody?

[Juror Santiago:]    No.

[Trial counsel:]    It was a few years ago?

[Juror Santiago:]    In 1989.

*King v. Warden, Ga. Diag. Prison*, 69 F.4th 856, 868 (11th Cir. 2023), summarizes the three-step inquiry that applies when evaluating an objection to a prosecutor's use of a peremptory challenge based on race:

> The Supreme Court has established a three-step process for evaluating objections that a prosecutor exercised his peremptory strikes on the basis of race or sex. *See J.E.B.*, 511 U.S. at 144–45. At the first step, "the defendant must establish a prima facie case by producing evidence sufficient to support the inference that the prosecutor exercised peremptory challenges on the basis of race [or sex]." *Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1199 (11th Cir. 2013). At the second step, "the burden shifts to the State to come forward with a neutral explanation" for its strikes. *Id.* (quoting *Batson*, 476 U.S. at 97). At the third step, the trial court must find, as a matter of fact, whether the defendant has established purposeful discrimination. *Id.* Typically, "the decisive question will be whether counsel's race- [or sex-]neutral explanation for [the] peremptory challenge should be believed." *Id.* (citation omitted).

> The trial court must "consider all relevant circumstances" at the third step, and the conviction cannot stand if even one of the strikes was discriminatory. *Id.* at 1199–1200. When a court considers a *Batson* claim in an appeal or a state habeas proceeding, the "state court's written opinion is not required to mention every relevant fact or argument" for its merits determination to receive deference on review by a federal court. *Id.* at 1223. Instead, the petitioner must prove that the state court failed to consider that argument or fact. *See id.* at 1222–23.

Even though the trial judge erroneously determined that Juror Santiago was not a member of a protected class, the trial judge exercised his discretion to reconsider his ruling. *Oliver v. Stone*, 940 So. 2d 526, 529 (Fla. 2d DCA 2006) ("It is

well established that a trial court may reconsider and modify interlocutory orders at any time until final judgment is entered.").

Under the first step in *Batson*, trial counsel demonstrated that the prosecutor exercised a peremptory challenge on Juror Santiago, who was Hispanic. (Trial Transcript at 351) Under the second step, the prosecutor explained that he exercised a peremptory strike on Juror Santiago because she failed to contact law enforcement after a person robbed her of a necklace. (*Id.* at 488–92) Under the third step, the trial judge considered the circumstances surrounding the strike and determined that the prosecutor's explanation was genuine. (*Id.* at 492)

The prosecutor's explanation is supported by the trial transcript. (Trial Transcript at 110–13) Hopkins fails to present any evidence that rebuts the trial judge's determination[6] and fails to demonstrate that the trial judge did not carefully consider all relevant circumstances when overruling the defense's objection. *King*, 69 F.4th at 868. Consequently, the state court did not unreasonably deny the claim. *Davis v. Ayala*, 576 U.S. 257, 273–74 (2015) ("A trial court is best situated to evaluate

---

[6] To demonstrate purposeful discrimination, a defendant may present evidence, such as "(1) 'statistical evidence about the prosecutor's use of peremptory strikes against [B]lack prospective jurors as compared to white prospective jurors in the case;' (2) 'evidence of a prosecutor's disparate questioning and investigation of [B]lack and white prospective jurors in the case;' (3) 'side-by-side comparisons of [B]lack prospective jurors who were struck and white prospective jurors who were not struck in the case;' (4) 'a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;' (5) 'relevant history of the State's peremptory strikes in past cases;' or (6) any 'other relevant circumstances that bear upon the issue of racial discrimination.'" *Sockwell v. Comm'r, Ala. Dep't Corrs.*, 141 F.4th 1231, 1240 (11th Cir. 2025) (quoting *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019)).

both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes. As we have said, 'these determinations of credibility and demeanor lie peculiarly within a trial judge's province,' and 'in the absence of exceptional circumstances, we [will] defer to the trial court.'") (citation omitted).

Ground One is **DENIED**.

## Ground Two and Ground Twenty-Two

In Ground Two, Hopkins asserts that the trial judge violated his federal right against self-incrimination by admitting into evidence testimony by a detective that during an interrogation Hopkins refused to answer questions and asked for an attorney. (Doc. 1 at 7) In Ground Twenty-Two, Hopkins asserts that trial counsel deficiently performed by asking a question on cross-examination that opened the door to the admission of the testimony by the detective. (Doc. 1 at 9)

### Ground Two

Hopkins asserts that the trial judge violated his federal right against self-incrimination by admitting into evidence testimony by a detective that during an interrogation Hopkins refused to answer questions and asked for an attorney. (Doc. 1 at 7)

At trial, Hopkins testified in his own defense. Hopkins denied that he knew Taha, denied that he participated in the homicide and robbery, and claimed that he spent the evening when the crimes occurred with Tiffany Watkins. (Trial Transcript at 814, 820, 821–28, 835)

31

On rebuttal, the prosecutor called a detective to testify. (Trial Transcript at 952) The detective testified that he and another detective asked Hopkins if he was willing to come to the police station for an interview. (*Id.* at 955) After Hopkins agreed, the detectives transported Hopkins to the police station. (*Id.* at 955–56) The detective denied that Hopkins was under arrest or in custody and testified that Hopkins was free to leave at any time. (*Id.* at 956) The detective asked Hopkins where he was the day before and the day of the homicide and testified about Hopkins's responses to those questions. (*Id.* at 956–59)[7]

On cross-examination, the prosecutor objected to a question by trial counsel about the interview as follows (Trial Transcript at 961–64):

> [Trial counsel:]    Did Mr. Hopkins refuse to answer any of your questions?
>
> [Prosecutor:]    Objection. We need to approach, Your Honor.
>
> [Trial counsel:]    Judge, I'm going to withdraw.
>
> [Prosecutor:]    No. No, we need to approach.
>
> [Trial counsel:]    I'll withdraw my question, Judge.
>
> [Trial judge:]    Come on up, please.
>
> (Whereupon, the following sidebar took place outside of the hearing of the jury.)
>
> . . .

---

[7] During the defense case, Hopkins testified that he voluntarily went to the police station for the interview. (Trial Transcript at 830–31)

32

| | |
|---|---|
| [Prosecutor:] | Your Honor, what happened was he did refuse to answer any more questions when they started talking about the homicide. And he said he wanted a lawyer. Now, the jury is left thinking — |
| [Trial judge:] | You can't unring that bell. |
| [Trial counsel:] | No, I wasn't finished asking my question. |
| [Trial judge:] | What was your question then? |
| [Trial counsel:] | I was going to ask him if he refused to answer any questions about Latoya Gunsby. |
| [Trial judge:] | No, no, that is not going to fly; you asked him if he refused to answer any questions. |
| [Trial counsel:] | And I paused. |
| [Trial judge:] | And he jumped up and objected. |
| [Prosecutor:] | I waited until you were through; there was a pause. |
| [Trial counsel:] | If counsel unartfully drafted a question and attempts to withdraw the question, there is nothing wrong with that. |
| [Trial judge:] | That jury is of the opinion that he physically cooperated and never refused to answer a question. |
| [Trial counsel:] | The jury has heard no testimony, as you have informed them, they haven't heard. |
| [Prosecutor:] | They have asked all the time, did he leave freely, did he come freely. |

| | |
|---|---|
| [Trial judge:] | Yes. I'm — you are allowed to get into that. |
| [Prosecutor:] | Thank you, Your Honor. |
| [Trial counsel:] | May I have a minute, Judge? |
| [Trial judge:] | Sure. I'd like you to step into the hall for just a minute, please. |
| [Bailiff:] | All rise. |

(Whereupon, the jury was escorted from the courtroom.)

| | |
|---|---|
| [Trial judge:] | Please sit down. Give me a read back on Mr. Mills's last question. |

(Whereupon, the court reporter read back the pertinent question.)

| | |
|---|---|
| [Trial judge:] | Same ruling. |

On redirect examination, the prosecutor asked the detective if Hopkins refused to answer any question (Trial Transcript at 967–68):

| | |
|---|---|
| [Prosecutor:] | Let me ask you the question Mr. Mills withdrew, and that is: Did there come a time when he refused to answer your questions? |
| [Detective:] | Yes. |
| [Trial counsel:] | That's not the question I was asking. |
| [Trial judge:] | That's true. I wonder if we could get that correct. |
| [Prosecutor:] | Yes. At any time, did he refuse to answer your questions? |

[Trial counsel:]    That's not the question either. Now, it's just being pounded down.

[Trial judge:]    I can't recall it. Madam court reporter, would you re-read that question?

(Whereupon, the court reporter re-read the requested question.)

[Prosecutor:]    Did Mr. Hopkins refuse to answer any of your questions?

[Detective:]    Yes.

[Prosecutor:]    And, did — how did that come about?

[Detective:]    After —

[Prosecutor:]    How did you get to that point?

[Detective:]    After he had given his previous statement of the accounts of what happened on Saturday and Sunday, we confronted him with the homicide and his involvement with the homicide. And he denied involvement and requested to speak to an attorney.

[Prosecutor:]    Thank you. And what about further questions of him?

[Trial counsel:]    Objection.

[Trial judge:]    Sustained.

[Prosecutor:]    Um, I have no further questions.

*Doyle v. Ohio*, 426 U.S. 610, 619 (1976), holds that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."

However, "[t]he Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). "Once a defendant decides to testify, . . . impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." *Jenkins*, 447 U.S. at 238. Also, "*Raffel* [*v. United States*, 271 U.S. 494 (1926)], clearly permits impeachment even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent." *Jenkins*, 447 U.S. at 236 n.2. *See United States v. Ard*, 731 F.2d 718, 727 (11th Cir. 1984) ("[W]hen the accused voluntarily takes the stand to protest innocence, the Fifth Amendment is not violated when the truthfulness of those statements is tested by the prosecutor's questions about prior inconsistent statements or acts.").

Hopkins testified that he did not commit the crimes and spent the evening when the crimes occurred with Watkins. (Trial Transcript at 814, 820, 821–28, 835) The detective testified that, after he confronted Hopkins with his involvement in the homicide, Hopkins denied any involvement and requested to speak with an attorney. (*Id.* at 968) Hopkins's refusal to answer any more questions impeached Hopkins's credibility as a witness who testified at trial. Consequently, the state court did not unreasonably apply federal law by denying Hopkins's claim. *Jenkins*, 447 U.S. at 238.

Also, whether trial counsel opened the door to the admission of Hopkins's refusal to answer any more questions is an issue of state evidentiary law, and a state court's determination of state law receives deference in federal court. *Estelle v.*

*McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

"As an evidentiary principle, the concept of opening the door allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted." *Davis v. State*, 217 So. 3d 1006, 1017 (Fla. 2017) (citation and internal quotations omitted). "[T]o open the door, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled." *Davis*, 217 So. 3d at 1017 (citation and internal quotations omitted).

Hopkins testified that he voluntarily went to the police station, voluntarily gave police a fingerprint exemplar, a footprint exemplar, and a DNA sample, and consented to a search of his home. (Trial Transcript at 830–31) He further testified that, when police returned him to his home, he did not abscond. (*Id.* at 832) During cross-examination of the detective, trial counsel confirmed that Hopkins voluntarily went to the police station for an interview, voluntarily gave the fingerprint exemplar, the footprint exemplar, and the DNA sample, and consented to a search of his home. (*Id.* at 960, 965–66)

Because this testimony, coupled with trial counsel's question whether Hopkins refused to answer any of the detective's questions, could have, if left unclarified, misled the jury to believe that Hopkins completely cooperated with the detectives, the trial judge did not unreasonably apply federal law by admitting evidence of Hopkins's refusal to answer questions about the crimes. *Davis*, 217 So. 3d at 1017.

37

*See also United States v. O'Keefe*, 461 F.3d 1338, 1348 (11th Cir. 2006) ("When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation. This principle is widely established.") (citations and internal quotations omitted).

Lastly, careful review of the trial transcript demonstrates that, during closing argument, the prosecutor did not refer to the detective's testimony about Hopkins's refusal to answer any more questions. Dring his testimony, Hopkins admitted that he did not disclose his alibi to his attorney until fourteen months after his arrest. (Trial Transcript at 851) Even if the trial judge erroneously admitted the detective's testimony, Hopkins fails to demonstrate that the single reference to his refusal during the six-day trial substantially and injuriously affected the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638–39 (1993).

Ground Two is **DENIED**.

**Ground Twenty-Two**

Hopkins asserts that trial counsel deficiently performed by asking the detective on cross-examination the question that opened the door to the admission of testimony by the detective. (Doc. 1 at 9) The post-conviction court denied the claim after an evidentiary hearing as follows (Respondent's Exhibit 28 at 374–76) (state court record citations omitted):

> Defendant testified that he went to trial in this case with two attorneys — Howardene Garrett and Peter Mills. The trial lasted seven days. Defendant was convicted of first-

degree murder, attempted robbery, and armed burglary and was given a life sentence.

. . .

Defendant [ ] argued that trial counsel opened the door for prejudicial testimony from Detective Navarro [ ]. Mr. Mills asked Detective Navarro if Defendant refused to answer any of his questions. The State then brought out more information from the detective regarding the Defendant's right to remain silent. This line of questioning made it seem like Defendant had a guilty conscience and that he did something wrong when he invoked his right to not speak with [the] detective.

. . .

On cross-examination, Defendant testified that his alibi was revealed fourteen months after he was arrested. The State's case consisted of showing that Defendant and his co-defendants were all involved in the murder. Defendant has been convicted of five felonies. Defendant cooperated with the investigation by giving his footprint[s] and fingerprint[s], and he consented to a search of his trailer. Defendant's trial counsel made it known at trial that Defendant was cooperative, and counsel highlighted the fact that Defendant did not skip town during the investigation. Defendant remained cooperative until the detective started asking about the murder. . . .

The State called Peter Mills as a witness. . . . Mr. Mills thought Defendant had been cooperative with the police, and he wanted to bring this out to the jury. Defendant had been cooperative with respect to what Defendant knew about Ms. Gunsby, a co-defendant. Counsel wanted to get this information and did not intend to open the door with regards to Defendant invoking his right to remain silent. When counsel paused, the State jumped in before counsel's question was completed. Later, Mr. Mills tried to get the same information a different way because it was so important to the case. The State had multiple eyewitnesses and DNA evidence, so this issue was just a bump in the case.

> Counsel did write a note to himself not to get into
> Defendant invoking his right to remain silent. The note
> also lists the ways in which the defendant cooperated.
> What is not listed is that Defendant agreed to answer
> questions. The consequence was not favorable. Mr. Mills
> was not happy with the way it turned out because he could
> not finish his question. Counsel was going to ask [ ]
> Defendant if he refused to answer any questions about Ms.
> Gunsby. It is Mr. Mills's opinion that this issue was not
> outcome-determinative.
>
> . . .
>
> [T]he court finds that the question asked by Mr. Mills
> opened the door allowing the Assistant State Attorney to
> ask Defendant about him not answering questions and
> asserting his right to silence. Counsel may have committed
> error by asking the question. However, the error was not
> so prejudicial as to undermine the confidence in the
> outcome given the totality of the evidence.

For the reasons explained above, even if trial counsel did not open the door to

the admission of the testimony that Hopkins refused to answer any further questions

about the homicide, the testimony was admissible on rebuttal to impeach Hopkins's

testimony at trial. *Jenkins*, 447 U.S. at 238; *Raffel*, 271 U.S. at 499. Also, during

closing argument, the prosecutor did not refer to the testimony that Hopkins refused

to answer any further questions. Even though evidence of Hopkins's refusal to

answer questions impeached his credibility, evidence of his other cooperation with

the detectives was presented to attempt to exculpate him. During his testimony,

Hopkins admitted that he did not disclose his alibi to his attorney until fourteen

months after his arrest. (Trial Transcript at 851)

Because Hopkins cannot demonstrate a reasonable probability that outcome at trial would change if trial counsel did not open the door, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

Ground Twenty-Two is **DENIED**.

**Ground Three**

Hopkins asserts that the prosecutor's allegedly improper comments during closing argument violated his federal right to a fair trial. (Doc. 1 at 7)

**Vouching for and Bolstering the Credibility of Putnam**

Hopkins contends that, during closing, the prosecutor impermissibly vouched for and bolstered the credibility of Putnam, the prosecutor's cooperating witness. (Doc. 1 at 7) In his brief on direct appeal, Hopkins challenged the following comments during the prosecutor's initial closing argument (Respondent's Exhibit 2 at 35–36) (bolding added):

> [Prosecutor:]    And let's say that [Putnam's] riding around for a half an hour or so, okay? And then [Gunsby] says: I'm leaving, take me back home [ ]. [Taha] takes her back home but before he takes her back home completely, he stops at the Hess station. That would put it at about — exactly 11:30 P.M., at exactly 11:30 P.M. That's why [Putnam] doesn't remember stopping there. And you know? If [Putnam], you know, you are asking do you remember him stopping. No, I don't remember, we went straight there, passed through a few lots. **He is telling the truth.** He is not tailoring his testimony for anything. It

is right near his house. They stop there. He takes her home, starts heading back to his house.

(Trial Transcript at 1020–21)

[Prosecutor:]    So, we have got [Putnam] driving and there is no evidence, and this is important, too. There is no evidence to the contrary that [Putnam] was not driving and driving the entire time. [Putnam] says that from the beginning. [Putnam] says that throughout. There is no evidence to the contrary that [Putnam] was not driving. Let me say this, too, about [Putnam]. He says — and I'll tell you. I'm not whitewashing [Putnam], that he is [ ] innocent or he didn't do anything. I'm just saying **he is telling the truth** about what happened. He said he knew that a robbery was going down. He knew why they were going over there, and he was the driver. And he was involved in the plan. He went the first time. He went the second time. He took his orders from Hopkins. And he did what Hopkins said. And that makes him just as guilty.

(Trial Transcript at 1025–26)

[Prosecutor:]    [Taha and Gunsby] come back out of the house and get in Taha's car, and [Taha] takes her back. [Jason Putnam] doesn't see her coming back, out of the house. He drives her over to the BP station, her grandmother['s] house or her aunt's. [Putnam] doesn't see her. He never saw her again after he dropped her off at the BP station until they regrouped at that house. That's what he was trying to say. And that's

what he said in court. And to pluck one line out of the deposition and say, isn't it true that you never, that you said you never saw her after you dropped her off at the BP station, that's not the whole picture. **He was not untruthful in that deposition.** He was trying just as hard as he was today or yesterday to give his testimony. Just as hard.

(Trial Transcript at 1037)

[Prosecutor:]  Um, now, [Putnam] comes back later on, and they say: Have you ever seen this sweatshirt before? No, I have never seen that sweatshirt before. What was Hopkins wearing on the night of the killing? Once again, **[Putnam's] being so honest** because he can't remember nine or ten or eleven months ago, that night. What was Hopkins wearing? I can't remember what he was wearing. **He is being honest; he is telling the truth.** You would think the answer would be, if somebody was feeding him answers or telling him what to say: Don't you remember, he was wearing that sweatshirt? Do you remember? No, nobody did that. And there is no evidence, there was no evidence to suggest that anybody told [Putnam] what to say, that [Putnam] got any reward for telling you all the same thing he told Joann and the police. Did not get any reward. **He had nothing to gain or lose by coming here and telling the truth.**

And he sure had something to lose if he tried to lie or minimize his involvement, tried to manage something else, blame somebody else,

> other than the guy he took orders from, Jerry Hopkins, that used him when he wanted a ride somewhere. That told him what to do and where to go. Just like he did Latoya Gunsby, and like he does [to] Tiffany Watkins. No. **[Putnam] is telling the truth**, and he has not a whole lot to gain or lose by changing his story of what he told Joann that fits in with all the evidence.

(Trial Transcript at 1044–45)

"'Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony.'" *Molina v. State*, 283 So. 3d 387, 388 (Fla. 3d DCA 2019) (quoting *Spann v. State*, 985 So. 2d 1059, 1067 (Fla. 2008)). "An attorney may argue the credibility of witnesses in closing argument, so long as the argument is based on the evidence presented at trial." *Dubon v. State*, 295 So. 3d 259, 272 (Fla. 4th DCA 2020). Because the prosecutor argued that the weight of the evidence presented at trial demonstrated that Putman testified truthfully and because the prosecutor did not either personally vouch for Putman or place the prestige of the prosecutor's office behind Putman, the prosecutor did not impermissibly comment on Putman's credibility.

Also, Hopkins challenged the following comments during the prosecutor's rebuttal argument (Respondent's Exhibit 2 at 35–36):

> [Prosecutor:]    All Putman does is to bring out the truth of the physical evidence, which they knew already. Hopkins. When they get over there, Hopkins comes out

and says, "I shot him in the back of the head." We have the medical examiner. [Gunsby] had on flip flops that night, she is barefoot, and the prints are found inside, flip-flops coming out. I came in the neighborhood that second time, and I dropped [Gunsby] and the two guys off at the stop sign. And proceeded to drive around the block. Kyle Cross, we knew that already.

**Everything [Putman] says is ringing, the truth ringing. Truth. Nothing to show he is lying. Ringing the truth. That's all he does.** But I think that is a lot. That's a lot.

(Trial Transcript at 1146–47)

Because the prosecutor argued that the weight of the evidence presented at trial demonstrated that Jason Putman testified truthfully, the prosecutor did not impermissibly comment on Putman's credibility. *Dubon*, 295 So. 3d at 272.

[Prosecutor:]  Now, as far as me lowering my voice, raising my voice, sometimes talking in a soft tone that sounds like a whisper, and then taking a tone that is tougher with a witness, approaching a witness, getting in their face, that's me. That's me. I told you at the beginning, you may not like my personality, you may not agree with the way I handle the case. You may not agree with the way I conduct cross-examination, or direct examination, or I find myself walking around as I am right now, you know?

Whether you call it dramatic or you call it whatever, Judge Maloney told you this is not a personality contest. You may not like that; but, that has

nothing to do, nothing to do with whether Jerry Hopkins is guilty of these offenses. And, I ask you, when you go back to the jury room, don't even talk about that. Don't talk about the way I did this or how I turned my back to a witness, and I don't like the way he maybe put his hand on the podium. Please.

That has nothing to do with the guilt of Jerry Hopkins. And, the same when it comes to Ms. Garrett, what she may have done. That has nothing to do with what we are doing, our jobs.

Let me tell you one thing as an officer of the court and a prosecutor, my job is not to trick you as jurors. My job is not to shade testimony, and I know each of you can see through if somebody is trying to do that. **My job is to seek the truth from that witness on the witness stand.** And if that means getting tough with a witness and going up and comparing one statement to another, one alibi to another, one story to another farfetched story, and when he denies letters to [Latoya] Gunsby and testing him on it, that's what I will do.

Whether the trial is today or next week. I have done it for twenty-five years in the past, and I make no apologies for that. And, please, pardon me. I don't make apologies to you as a jury for trying to seek the truth in any ethical manner I can [ ].

(Trial Transcript at 1123–24)

During closing, trial counsel argued that the jury should ignore theatrics by the prosecutor and instead focus on the testimony and other evidence presented at trial (Trial Transcript at 1109):

> [Trial counsel:]    Beware of an argument that comes in the form of a dramatic re-enactment of a conclusory statement as to how something happened or had to have happened, and who is telling the story. The evidence comes from the witness stand. And dramatic renditions and raising and lowering your voice, and marching around the courtroom and pointing, or shouting or turning your back on a witness or pounding the podium is not evidence. Evidence comes from that witness stand. That's the evidence that you must rely upon.

Also, trial counsel argued that the prosecutor presented evidence that only supported the prosecutor's theory of the case and did not present all the evidence to show the "whole story." (Trial Transcript at 1101–02)

Because the prosecutor fairly replied to these comments by explaining why he may have examined a witness with a less than cordial tone, the prosecutor's comments were not impermissible. *McKenney v. State*, 967 So. 2d 951, 955 (Fla. 3d DCA 2007) ("Where there is an allegation of improper comments by a prosecutor, we do not consider the comments themselves in a vacuum; rather, we view the allegedly-wrongful comments in context. Under the principles known variously as 'fair reply' or 'invited response,' defense counsel's comments are examined as well.").

**Facts Not in Evidence**

Hopkins contends that, during closing, the prosecutor impermissibly stated facts not supported by evidence by "testif[ying] from his own purported personal knowledge of the circumstances of Putman's deposition" and by "falsely represent[ing] the circumstances of that deposition in order to mislead the jury." (Doc. 1 at 7)

In his brief on direct appeal, Hopkins challenged the following comment by the prosecutor during the initial closing argument (Respondent's Exhibit 2 at 22–23):

> [Prosecutor:]    Let's go, I want to go back to Jason Putman's testimony. Direct — Mr. Castillo was not leading him. He was asking him questions. What happened then. What did you see. Where did you go. And I think, but it really doesn't matter what I think, it is what you think. But it was obvious without Mr. Castillo even going into it, that Jason Putman has a learning disability.
>
> And, please, I do not mean this unkindly, but probably has a very, very low intellect. And he struggles with verbalizing things. He struggles with receiving information and processing it, and thinks very carefully or tries to figure out what the question is, and trying his best to come up with a truthful, honest answer without overstating or understating. I suggest to you that was very, very obvious on direct examination.
>
> Now, I think it is worth talking about what happened on cross-examination and what happened in his deposition.

You had heard that he was deposed by one of these defense lawyers, and another defense lawyer over a two-day period. The first day going to six or 6:30 in the evening, and starting back the next morning on him. And, yes, you saw the way defense counsel was firing questions at him here in court today. Well, take that and double it, double the —

[Trial counsel:]    Objection, Your Honor. This is improper. He is suggesting that we abused the witness or something like that. And that was not suggested at any time in any testimony in this trial.

[Trial judge:]    Improper argument. Overruled.

[Prosecutor:]    Thank you, Your Honor. Take that and double it. You got two defense attorneys in there working on him. Okay. Then we come to trial here. And, of course, they had everything typed up and brought it in. And, I am going to suggest to you what happened in this cross-examination of him was this. And it happened from the very first question for which that deposition was used, and it continued every time that deposition was used against [Putnam].

First question, I can't think of what page it was, but defense counsel reads him a question and says: "Didn't you say this in response to this question?" And defense counsel starts into it, this is how it all started and continued throughout. Mr. Castillo gets up and says: "Judge, [in] all fairness she needs to read the rest of that, or the jury is going to be mislead." And [the] judge

says: "How far were you going to read, counselor?" And she says: "Well, only up to," I think, it was, "line seven." I can't remember. And the judge says: "No, you need to read all the way to line fifteen on [the] next page." And, again, Mr. Castillo gets up and says: "Judge, she didn't read his answer when it says, isn't it true that you can't read or write." And, he says, "Yes, I can't read or write."

[Trial counsel:]    Your Honor, I object. This is improper argument. Rather than arguing the facts, he is attacking the defense counsel directly, and I suggest the procedure is improper, and I'm going to object to that improper argument.

[Trial judge:]    I don't think that is what he is trying to do. Overrule the objection.

[Prosecutor:]    Then throughout, what defense did is pick outlines of that two-day deposition and read: "Isn't it true that you said, during the deposition, that you never saw a gun, and now you come in court here — and saying he had this gun, this 45." He is shaken up, and he is kind of shaken up, and I think you ought to remember that. And he is easily led, easily led. And he is going to say, yeah, yeah, yeah, yeah, that's what I said. He said he didn't see a gun. Well, that's not what he said. He said he didn't see a gun, just like he said here. Talked about the gun wrapped in the towel. He saw the impression on the towel. But that's not the impression that you all got from the deposition.

(Trial Transcript at 1032–35)

50

At trial, Putman testified that he could not read because of a learning disability. (Trial Transcript at 575) He testified that, before trial, counsel deposed him for two days. (*Id.* at 618, 628) He testified that the first day of the deposition concluded at 6:07 P.M. (*Id.* at 642) He testified that trial counsel and other attorneys were present. (*Id.* at 618) He testified that he answered questions asked at the deposition to the best of his ability. (*Id.* at 619)

During cross-examination, after trial counsel impeached Putman with his deposition testimony concerning his ability to read, the prosecutor asked the trial judge to require trial counsel to read the entire excerpt of deposition testimony concerning Putnam's ability to read. (Trial Transcript at 628–30) Also, trial counsel asked Putman whether he saw an "actual gun," and Putman responded that he saw a gun wrapped in a towel but agreed that he did not know if it was an "actual gun." (*Id.* at 650–51) Trial counsel attempted to impeach Putnam with numerous other excerpts of the deposition transcript, and Putman denied remembering making the statements during the deposition. (*Id.* at 646–49)

Because the prosecutor's comments accurately described Putman's testimony at trial about the deposition, the prosecutor's comments were not impermissible. *Gonzalez v. State*, 136 So. 3d 1125, 1143 (Fla. 2014) ("'The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.'") (quoting *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985)).

**Denigrating the Defense**

Hopkins contends that, during closing, the prosecutor impermissibly denigrated the defense. (Doc. 1 at 7) In his brief on direct appeal, Hopkins challenged the following comment by the prosecutor during the rebuttal argument (Respondent's Exhibit 2 at 36):

> [Prosecutor:]     But with that said, I must respond to comments made by defense counsel in closing argument. First of all, I want to make it absolutely clear that if I made any comments during this trial to — that made you think that I was attacking the personal integrity of defense counsel, um, I tell you I was not. And please don't construe that as such. I did not make any comments — well, first of all. Please take that as such, and don't interpret at all any of my comments to be an attack on her personally or Mr. Mills.
>
> They are defense lawyers, doing their job, they are fighting very, very hard and they are defending a man, who is obviously guilty of first-degree murder. And they are doing everything that they can. Now, but I must respond to the personal attacks upon me.
>
> Saying that Mr. Antonello made a deal with the devil. I'm not sure who she is characterizing as the devil, whether it be Jason Putman or whomever, but there is no evidence at all, whatsoever, that Mr. Antonello or the State or any police officers have made any deals with Jason Putman. Simply no evidence whatsoever.

(Trial Transcript at 1118–19)

Hopkins contended that the prosecutor's comment "damned the defense function with condescending praise." (Respondent's Exhibit 2 at 36)

During closing, trial counsel argued that the prosecutor's statement that Putman was mentally disabled was "made up out of whole cloth" and that the prosecutor failed to present any evidence of a disability. (Trial Transcript at 1089) Trial counsel further argued that Putnam did not credibly testify and that the prosecutor made a "bargain with the devil" by presenting the incredible testimony (*Id.* at 1091):

| | |
|---|---|
| [Trial counsel:] | [H]e is faced with a situation where he has a witness that was not believable, who cannot tell the same story. And so, he was stuck with that and he has to attack me. He has made his bargain with the — |
| [Prosecutor:] | Objection. I was not attacking Ms. Garrett. |
| [Trial judge:] | Overruled. Please continue. |
| [Trial counsel:] | Thank you, Your Honor. Prosecution has made his bargain with the devil, and he is stuck with what the devil says. |
| [Prosecutor:] | Objection, Your Honor. |
| [Trial judge:] | It's argument. Overruled. |

Trial counsel further argued that the prosecutor presented evidence that only supported the prosecutor's theory of the case and did not present all the evidence to show the "whole story." (Trial Transcript at 1101–02)

Because the prosecutor fairly replied to these arguments about his "bargain with the devil" and his fabrication of evidence, the prosecutor's comments were not impermissible. *McKenney*, 967 So. 2d at 955.

| | |
|---|---|
| [Prosecutor:] | As to why we did not call Mr. Taha, Abed, and defense counsel suggests — not suggests, she tells you. That the State is trying to hide something from you, just as the State was trying to hide the rest of the jury instructions. The State is trying to trip you up, as she says. That the State is shading the testimony. And the reason the State did not call Mr. Taha is because he came out of his house Wednesday afternoon, or came to the door that Wednesday afternoon before, and Latoya Gunsby was there. And he looked out into the street, and he saw an Expedition out in the street. And therefore, boy, we don't want the jury to know this. My gosh. |
| | [Putnam] may be involved in this. Hopkins may have driven it over there. We could speculate. Was that really the white Expedition? Was it Simmons that was driving? Was [Putnam] even there? Um, boy, let's throw that smoke screen out. |
| [Trial counsel:] | Objection, Your Honor. Improper argument, Your Honor. It is improper to call the defense argument a smoke screen. |

[Trial judge:]        Overruled.

(Trial Transcript at 1150–51)

During closing, trial counsel argued that the prosecutor failed to present testimony by Taha's brother, Abed Taha, and other evidence because the prosecutor wanted to "make [Putnam's testimony] look as good as possible" (Trial Transcript at 1101–02):

[Trial counsel:]       Now, talking a little bit about the evidence we presented, and I suggest to you that the prosecution did not present this evidence because they are only presenting to you what supported their theory. That is why they did not present the evidence of Mr. Taha, that Latoya Gunsby came to his house the Wednesday before this happened. And the evidence that she was in the white Expedition. And not the records that show that Jason Putnam was not working as he said. That is why they did not show you the T-shirt that was found there at the scene. And the evidence on it, that they couldn't link to anyone. I suggest that is why the samples were not given of Jason Putnam and Leon Simmons.

The burden of proof is on the prosecutor to prove every material element of the crime. There is no burden of proof on the defense. And we wanted you to see the whole story, so we showed you the evidence presented. We showed, at least, Jason Putnam was lying, as I argue to you. We didn't want to have to do this. It was unfortunate to call Mr. Taha. That

is a very painful experience for him and his family. We tried to limit his testimony just to what happened before.

Why did the prosecution not give you all the evidence that you are entitled to, so you could know the whole story? Because they are stuck with the story of Jason Putnam and are trying to make it look as good as possible.

"Prosecutorial misconduct can be a basis for relief if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Land v. Allen*, 573 F.3d 1211, 1219 (11th Cir. 2009) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "Due process is denied 'when there is a reasonable probability,' or 'a probability sufficient to undermine confidence in the outcome,' that, but for the improper remarks, 'the outcome of the proceeding would have been different.'" *Parker v. Allen*, 565 F.3d 1258, 1274 (11th Cir. 2009) (citation omitted). "Any challenged remarks must be evaluated in context based upon the defense argument that preceded it." *Whisenhant v. Allen*, 556 F.3d 1198, 1207 (11th Cir. 2009). "Where the 'objectionable content was invited by or was responsive to the opening summation of the defense,' a reviewing court must determine the comment's effect on the trial as a whole." *Whisenhant*, 556 F.3d at 1207 (quoting *Darden*, 477 U.S. at 182).

The prosecutor's comment about the "smoke screen" may have improperly denigrated the defense. However, the prosecutor did not repeat the comment and only made the comment in response to trial counsel's argument that the prosecutor

was hiding evidence. Considering the defense's closing argument, the evidence presented at trial, and the rest of the state court record, the state appellate court did not unreasonably deny the federal due process claim. *Reese v. Sec'y, Fla. Dep't Corrs.*, 675 F.3d 1277, 1287 (11th Cir. 2012) ("Our inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, and the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process.") (citation omitted); *Jackson v. State*, 301 So. 3d 477, 481 (Fla. 1st DCA 2020) ("[W]hile the reference to 'smoke and mirrors' may have been objectionable, when read in context, such a reference may not always be impermissible argument. Here, this reference would not constitute fundamental error on its own. This single reference to 'smoke and mirrors' was not sufficient to vitiate the whole trial.") (citations omitted).

Ground Three is **DENIED**.

**Ground Six**

Hopkins asserts that the trial judge violated his federal rights by denying a motion for mistrial after an emotional outburst by Taha's mother during trial. (Doc. 1 at 7) During the prosecutor's opening statement, the trial judge denied the defense's motion for a mistrial as follows (Trial Transcript at 370–71):

> [Prosecutor:]    You'll see photographs of how it is set up. [Taha] sees these individuals approaching, doesn't know who they are or what they are doing. He walks out wondering what's up. Hopkins comes up to him. [Taha] turns and starts to run toward his door. Hopkins

starts in pursuit; he is chasing him up to the door. Hopkins runs out of his slippers into the doorway, and as soon as he gets into the door, Hopkins is right behind him, he is right behind him, and that gun is right up against [Taha's] head to the back. Hopkins pulls the trigger. [Taha] falls. As he is facing in, he falls. There is an aquarium, here, on a table. He falls. His head appears to hit —

(Courtroom interruption.)

[Trial judge:]      Take your time, take your time, Mr. Antonello.

[Trial counsel:]    Judge, could we have a sidebar?

[Trial judge:]      Yes, sir.

(Whereupon, the following sidebar took place outside of the hearing of the jury.)

. . .

[Trial counsel:]    Judge, I just would like to have the record reflect what just happened. A woman screamed out for an extended period while Mr. Antonello was giving his opening statement and several, what appeared to be family members, attempted to carry her out. Eventually, one man, wearing all brown, lifted her up in the air and carried her.

[Trial judge:]      That's an accurate statement.

[Trial counsel:]    At this time, I move for a mistrial.

[Trial judge:]      Motion denied. Let me know when you are ready, Mr. Antonello.

"[The United States Supreme Court] has never addressed a claim that [ ] private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 76 (2006). "Reflecting the lack of guidance from [the United States Supreme Court], lower courts have diverged widely in their treatment of defendants' spectator-conduct claims." *Carey*, 549 U.S. at 76. "Given the lack of holdings from [the United States Supreme Court] regarding the potentially prejudicial effect of spectators' courtroom conduct of the kind involved here, it cannot be said that [a] state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey*, 549 U.S. at 77 (quoting 28 U.S.C. § 2254(d)(1)).

Consequently, Hopkins fails to demonstrate under Section 2254(d)(1), that the state court unreasonably applied clearly established law as determined by the Supreme Court of the United States by denying his claim. *Bowles v. Sec'y, Dep't Corrs.*, 608 F.3d 1313, 1315 (11th Cir. 2010) ("The Supreme Court 'has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.'") (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Also, "[b]ecause the trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst, the decision on whether to grant a mistrial lies within his sound discretion." *Messer v. Kemp*, 760 F.2d 1080, 1087 (11th Cir. 1985). "Absent an abuse of that discretion, [a reviewing court] will not intervene." *Messer*, 760 F.2d at 1087. The record demonstrates that, during the prosecutor's opening statement, a

spectator screamed for an extended period of time, members of the spectator's family attempted to carry the spectator out of the courtroom, and a male lifted the spectator and carried her out of the courtroom.

Before opening statements, the trial judge instructed the jury that the verdict must be based on "what the witnesses say from the witness stand," "whatever physical exhibits may be introduced in evidence," and "what [the trial judge] say[s] is the applicable law." (Trial Transcript at 356–57) The trial judge reiterated that "in making [a] decision, [the jury is] to consider what the witnesses said, the physical exhibits introduced, and, the law, and nothing else." (*Id.* at 357)

Six days later, during the final charge, the trial judge instructed that the case was "not to be decided for or against anyone because [the jury] feel[s] sorry for somebody or somebody's made [the jury] angry." (Trial Transcript at 1180) Also, the trial judge instructed the jury that "[the] verdict is not to be influenced by any feelings of prejudice or bias or sympathy" and that "[the] verdict must be based on the evidence and the law as contained in [the jury] instructions." (*Id.* at 1181) Because a reviewing court presumes that the jury follows a trial judge's instructions in a criminal case and because the outburst occurred in the very beginning of a six-day trial, the state court did not unreasonably deny the federal claim. *Messer*, 760 F.2d at 1087. *Samia v. United States*, 599 U.S. 635, 646 (2023).

Ground Six is **DENIED**.

**Ground Twenty**

Hopkins asserts that trial counsel deficiently performed by not requesting a jury instruction for an alibi defense. (Doc. 1 at 8) The post-conviction court denied the claim as follows (Respondent's Exhibit 28 at 74):

> Defendant argues that trial counsel was ineffective for failing to have the court read the alibi jury instruction. A specific alibi instruction was not read to the jury. Even if trial counsel can be said to have been deficient for not having this instruction read, the Defendant cannot establish prejudice. The jury was advised to decide for themselves which witness was believable. The jury heard the alibi testimony of Tiffany Watkins, and decided to disregard her testimony as evidenced by the verdict in the case. Upon rendering their verdict, the jury determined that the Defendant was present at the scene when the crimes were committed and did commit them. Defendant has not established prejudice for not having the instruction. As such, [the claim] is denied.

Florida Standard Criminal Jury Instruction 3.6(i), instructs a jury on the defense of alibi as follows:

> An issue in this case is whether defendant was present when the crime allegedly was committed.
>
> If you have a reasonable doubt that the defendant was present at the scene of the alleged crime, it is your duty to find the defendant not guilty.

Trial counsel did not request the instruction, and the trial judge did not read the instruction to the jury.

The trial judge instructed the jury to decide the credibility of a witness as follows (Trial Transcript at 1177–79):

[Trial judge:]        You are the judge of the facts of this case. In that role, it is up to you to decide what evidence is reliable, to decide what witnesses are believable, and to decide whether sufficient evidence has been presented to you to justify a conviction. In making those decisions, you are to use your common sense.

Regarding the witnesses, it is entirely proper for you to take into consideration not only what the witness said but how the witness behaved in the courtroom. Nonverbal communication may be considered by you in deciding whether to believe a witness.

Now, there are certain criteria that should be taken into consideration. You should consider whether the witness had the opportunity to see or to know or see things about which he or she testified. Consider whether the witness seemed to have an accurate memory. In your opinion, was the witness straightforward and honest in answering the questions asked by both lawyers, or trying to answer the questions? Did the witnesses' testimony agree with the other testimony and the physical evidence in this case? Also, did the witness or has the witness been offered or received any money, preferred treatment, or any benefit in order to get the witness to testify? Had any pressure or threat been used against the witness that affected or would affect the truth of the witness's testimony? Did the witness at some other time make a statement that is inconsistent with the testimony he or

she gave in court? And was it proved that the witness had been convicted of a felony or a crime involving dishonesty?

You have to rely on your own conclusions about witnesses. As a juror, you have the right to believe everything a particular witness said, or you may pick and choose and believe part of it and don't believe the rest.

Mr. Hopkins became a witness in this case, and you should apply the same rules to your consideration of his testimony that you apply to the testimony of any of the other witnesses.

During the defense case, Hopkins, a twice convicted felon, testified that Gunsby was his girlfriend. (Trial Transcript at 811–12, 836) He testified that he and Gunsby dated other persons, too. (*Id.* at 812) The crimes occurred in the early morning of Monday, August 4, 2003. (*Id.* at 408) Hopkins testified that on Friday, August 1, 2003, Gunsby spent the night with him at his home. (*Id.* at 812–14) Hopkins testified that Gunsby left the next day at 1:00 P.M., and that he did not see Gunsby any other time that weekend. (*Id.* at 814)

Hopkins denied that Gunsby spoke to him about committing a robbery. (Trial Transcript at 814, 820) He denied committing the robbery. (*Id.* at 820) He denied calling Gunsby on Sunday night or going to her house or Putman's house on Sunday night. (*Id.* at 820–21)

Hopkins testified that, on Sunday afternoon, he walked to a store to buy cigarettes and saw Tiffany Watkins. (Trial Transcript at 821–22) He testified that he had known Watkins for a few years, that he and Watkins had mutual friends, and that he and Watkins were just friends. (*Id.* at 822–23) He testified that he invited Watkins to his home because Watkins was crying after an argument between her and her parents about her boyfriend. (*Id.* at 824–25) He testified that Watkins spent Sunday night at his home with him. (*Id.* at 825) He testified that he and Watkins watched a movie and played cards. (*Id.* at 825–26) He testified that he and Watkins went to sleep around 11:30 P.M. that evening, that he woke up around 5:30 A.M. the next morning, and that Watkins drove him to work. (*Id.* at 827–28)

On cross-examination, after the prosecutor confronted Hopkins with a love letter that Hopkins received from Watkins while in jail, Hopkins clarified that he and Watkins became closer after his arrest. (Trial Transcript at 856–60) Hopkins admitted that Watkins had written him over two thousand pages of letters since his arrest. (*Id.* at 860)

Hopkins testified that he voluntarily spoke with the detectives a few days after the crimes occurred. (Trial Transcript at 830) However, Hopkins did not tell the detectives about his alibi and did not tell his attorney about his alibi until fourteen months after his arrest. (*Id.* at 832, 851) He explained why he did not immediately tell the detectives and his attorney about his alibi:

[Trial counsel:]    No, um, did you, um, immediately, um, tell everyone that Tiffany was with

|  |  |
|---|---|
|  | you the night that this robbery had taken place? |
|  | . . . |
| [Hopkins:] | No, ma'am. |
| [Trial counsel:] | Why not? |
| [Hopkins:] | Because, well, Tiffany and her parents don't really, like I said before, don't agree with blacks and whites mingling. And she talked to a black guy, and she was spending the night with a black guy. I didn't want no more falling out with her parents, before they were already back on good terms. |
| [Trial counsel:] | Were you concerned that failing to provide her name might hurt you? |
| [Hopkins:] | Yeah. In a way, it would hurt her. |
| [Trial counsel:] | I'm sorry, what did you say? |
| [Hopkins:] | It wouldn't hurt me. |
| [Trial counsel:] | You were afraid it would hurt her? |
| [Hopkins:] | Yes, ma'am. |
| [Trial counsel:] | How would it hurt her? |
| [Hopkins:] | Several reasons. First, as far as her parents, their situation, I didn't mean for her to have a falling out with her parents. And I knew Simmons and Putman were free. And I would have her be a witness for me, which I knew she was there with me. I didn't want her not protected and something happen to her in the process. |

(Trial Transcript at 832–34)

| | |
|---|---|
| [Trial counsel:] | Just to clarify, were there other reasons why you didn't give her name, also? |
| [Hopkins:] | Yes, ma'am. |
| [Trial counsel:] | Could you tell us about that? I think you have before, but I want to make it clear. If you could tell us about that again, please? |
| [Hopkins:] | Well, I felt that being that Jason Putnam and Mr. Simmons [were] friends. And Miss Watkins was the only person who knew where I was that night, if I bring her in as a witness that her life would be in jeopardy, or she could be harmed. And I wanted her to be protected. And I didn't know how she was going to be protected then. |

(Trial Transcript at 872–73)

Tiffany Watkins testified that she spent the night at Hopkins's home the first weekend in August of 2003 because of an argument between her and her parents about her boyfriend. (Trial Transcript at 891–92) She testified that she saw Hopkins at the store and that Hopkins invited her to spend the night at his home because she was upset. (*Id.* at 893) She testified that they fell asleep about 11:30 P.M. and that she and Hopkins woke up the following morning to go to work. (*Id.* at 895–96)

Watkins learned about Hopkins's arrest by searching his name on the internet. (Trial Transcript at 896–97) She testified that she and Hopkins became closer when she started visiting him in jail. (*Id.* at 898) She testified that, in 2004, after Simmons confronted her at a McDonald's restaurant, she told Hopkins about the

confrontation. (*Id.* at 898–99) She testified that Hopkins told her that he would tell his attorney about the confrontation. (*Id.* at 899) She testified that later an investigator spoke to her about the confrontation, that she first learned the date of the crimes during her conversation with the investigator, and that she realized that she and Hopkins were together on that day. (*Id.* at 901)

In rebuttal, a detective testified that during the interview with Hopkins four days after the crimes, Hopkins stated that, on Saturday, August 2, 2003, Gunsby spent the night at his home. (Trial Transcript at 956) Hopkins told the detective that Gunsby's aunt or mother picked her up from his home on Sunday, August 3, 2003, at 12:00 P.M. (*Id.* at 956–57) Hopkins told the detective that on Sunday, August 3, 2003, he spent the evening at a friend's house. (*Id.* at 957) Hopkins said that, in the early morning on Monday, August 4, 2003, his cousin Maurice drove him to pick Gunsby up. (*Id.* at 958–59)

The trial judge thoroughly instructed the jury on how to evaluate the credibility of each witness. The jury evaluated Hopkins's and Watkins's testimony against Putman's and the detective's testimony. Hopkins's alibi defense was severely undermined by his two prior felony convictions, his inconsistent statements to the detective, the fourteen-month delay in his disclosure of the alibi to his attorney, and his romantic relationship with Watkins. Watkins was the only person who corroborated Hopkins's testimony about the alibi. However, during trial, Watkins held strong romantic feelings for Hopkins, and those strong romantic feelings critically undercut her credibility.

Because the trial judge instructed the jury on how to evaluate the credibility of each witness and because Hopkins failed to demonstrate a reasonable probability that the outcome at trial would change if the trial judge had given the alibi instruction, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694. *Hope v. Cartledge*, 857 F.3d 518, 523–26 (4th Cir. 2017) (holding that the petitioner failed demonstrate prejudice under *Strickland* from counsel's failure to request alibi instruction because "the crucial issue at trial was witness credibility, and the parties presented the jury with two different and irreconcilable factual scenarios" and "the trial court specifically instructed the jury that it must judge credibility").

Ground Twenty is **DENIED**.

**Ground Seven and Ground Twenty-Four**

In Ground Seven, Hopkins asserts that cumulative error arose from the trial judge's erroneous rulings and the prosecutor's misconduct. (Doc. 1 at 7) In Ground Twenty-Four, Hopkins asserts that cumulative error arose from trial counsel's deficient performance. (Doc. 1 at 9) Because the individual claims of error are meritless, the cumulative error claims are also meritless. *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012) ("This Court has made clear that where '[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit.'").

Ground Seven and Ground Twenty-Four are **DENIED**.

Accordingly, Hopkins's petition (Doc. 1) for a writ of habeas corpus is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Hopkins and **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Hopkins neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on September 16, 2025.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE